IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 7, 2016

IN RE M.B.R.

Appeal from the Juvenile Court for Hamblen County
No. J140007     Janice Hope Snider, Judge

_____

No. E2015-01906-COA-R3-PT-FILED-JUNE 23, 2016
_____

This is a termination of parental rights case. The Department of Children's Services filed
a petition to terminate the parental rights of B.L.R. (Father) with respect to his child,
M.B.R. (the Child). The trial court found clear and convincing evidence of four grounds
supporting termination. The court also found, by the same quantum of proof, that
termination is in the best interest of the Child. Father appeals. We affirm.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed as Modified; Case Remanded

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL
SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

Gerald T. Eidson, Surgoinsville, Tennessee, for the appellant B.L.R.

Herbert H. Slatery III, Attorney General and Reporter, and Rebekah A. Baker, Senior
Counsel, for the appellee, Tennessee Department of Children's Services.

OPINION

I.

On January 8, 2014, Hamblen County Sheriff deputies visited Father's home as
part of an investigation into a series of burglaries of which Father was a suspect. After
obtaining consent to search the house, the officers entered and saw the Child, who was
approximately five months old, lying on a couch with open needles next to her. Drug
paraphernalia was found throughout the residence. Officers also discovered
methamphetamines, marijuana, and benzodiazepines. The Child was placed in the
custody of DCS. Father was arrested for possession of illegal substances. Following his

arrest, Father submitted to a drug screen. He tested positive for amphetamine, benzodiazepine, methamphetamine, marijuana, and buprenorphine.

On January 15, 2014, DCS filed a petition for temporary legal custody. At the same time, DCS sought a declaration that the Child was dependent and neglected. After a hearing in the trial court on April 16, 2014, the Child was adjudicated dependent and neglected the following day. Though incarcerated at the time, Father was present with an attorney at the April 16, 2014 hearing. He stipulated that, due to his incarceration, the Child was dependent and neglected.

In the ensuing months, Father was convicted of multiple crimes that had all taken place after the Child was born. On May 29, 2014, Father was found guilty of attempted burglary, three counts of vandalism, burglary other than habitation, theft of property under $500, and attempted burglary other than habitation. Father received the following concurrent sentences: one year for attempted burglary; two years and one day for the first count of vandalism; two years and one day for burglary other than habitation; eleven months and twenty-nine days for theft of property under $500; eleven months and twenty-nine days for the second count of vandalism; one year for attempted burglary other than habitation; and eleven months and twenty-nine days for the third count of vandalism.

On December 1, 2014, Father was found guilty, this time in Grainger County, of aggravated burglary, two counts of theft over $1,000, burglary, vandalism over $500, and assault. Father received the following sentences, all of which were to run concurrent with his sentences from Hamblen County: four years for aggravated burglary; four years for the first count of theft over $1,000; four years for burglary; four years for the second count of theft over $1,000; two years for vandalism over $500; and eleven months and twenty-nine days for assault.

Over time, DCS created three permanency plans for Father. The first plan, dated February 6, 2014, had the following requirements: (1) submit to random drug screens within two hours after a request by DCS or the guardian ad litem; (2) undergo an alcohol and drug assessment and comply with any recommendations; (3) obtain stable housing and income; (4) complete parenting classes and comply with any recommendations; and (5) undergo a mental health assessment and comply with any recommendations. The second plan, dated August 4, 2014, had essentially the same requirements. The third plan, dated February 2, 2015, had similar requirements to those of the first two plans. The third plan did add the requirement that, upon release from jail, Father was to start making child support payments.

On March 25, 2015, DCS filed a petition to terminate Father's parental rights. In the petition, DCS alleged six separate grounds for termination: (1) abandonment by an incarcerated parent due to his failure to visit the Child, said ground being pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) (2014) and 36-1-102(1)(A)(iv), -102(1)(E) (2014); (2) abandonment by an incarcerated parent as a result of Father's failure to support pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv), -102(1)(D); (3) abandonment by an incarcerated parent as a result of Father's wanton disregard pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(A)(iv); (4) abandonment as a result of Father's failure to provide a suitable home pursuant to Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(ii); (5) Father's substantial noncompliance with a permanency plan pursuant to Tenn. Code Ann. §§ 36-1-113(g)(2) and 37-2-403(a)(2) (2014); and (6) persistence of conditions pursuant to Tenn. Code Ann. § 36-1-113(g)(3). A trial was held on August 5, 2015. During the trial, DCS nonsuited two of the grounds alleged in its petition: abandonment as a result of failure to visit and abandonment as a result of failure to support. On September 3, 2015, the trial court entered an order terminating Father's parental rights after finding clear and convincing evidence supporting the remaining four grounds alleged by DCS. In addition, the trial court held that there was clear and convincing evidence that termination was in the Child's best interest.

## II.

Father filed a notice of appeal on September 28, 2015, raising the following singular issue, as taken verbatim from his brief:

> Whether the [c]ourt erred in finding it was in the child's best interest to terminate the [Father's][1] parental rights.

## III.

"A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re S.M.*, 149 S.W.3d 632, 638 (Tenn. Ct. App. 2004) (citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000)) (internal citations omitted).

---

[1] Here and in one other place in his brief, Father actually asserted that the trial court erred in terminating *mother's* parental rights. The record reflects that the Child's biological mother voluntarily surrendered her parental rights on August 5, 2015; but, even if she had not surrendered her rights, Father would have no standing to raise *mother's* rights. We believe that the reference to *mother's* rights was simply a mistake.

However, this right is not absolute. *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005) (citing *State Dep't of Children's Servs. v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004)).

Parties seeking to terminate a biological parent's parental rights must prove, by clear and convincing evidence, at least one statutory ground. *In re Adoption of S.T.D.*, No. E2007-01240-COA-R3-PT, 2007 WL 3171034, at *3 (Tenn. Ct. App., filed Oct. 30, 2007) (citing Tenn. Code Ann. § 36-1-113(c)(1)). A petitioner also must prove by clear and convincing evidence that termination is in the child's best interest. *Id.* (citing Tenn. Code Ann. § 36-1-113(c)(2)). "Clear and convincing evidence is evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (internal quotation marks and citation omitted).

The Supreme Court has recently delineated our standard of review:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016) (internal citations omitted).

"When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to . . . the trial court's factual findings." *In re Adoption of S.T.D.*, 2007 WL

3171034, at *4 (citing *Seals v. England/Corsair Upholstery Mfg. Co., Inc.*, 984 S.W.2d 912, 915 (Tenn. 1999)).

## IV.

This court has previously stated that,

> [t]he ultimate goal of every proceeding involving the care and custody of a child is to ascertain and promote the child's best interests. However, as important as these interests are, they do not dominate every phase of a termination of parental rights proceeding. The best interests of the child do not become the paramount consideration until the trial court has determined that the parent is unfit based on clear and convincing evidence of one or more of the grounds for termination listed in Tenn. Code Ann. § 36-1-113(g).

*In re Audrey S.*, 182 S.W.3d at 877. In the present action, the trial court found, by clear and convincing evidence, the four remaining grounds alluded to earlier in this opinion. On appeal, Father has not challenged any of these decisions. Nevertheless, we are required to review all of the trial court's findings with respect to grounds and best interest. *In re Carrington*, 483 S.W.3d at 525 (". . . we hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.")

## V.

## A.

When analyzing the first ground for termination, abandonment as a result of Father's wanton disregard, the trial court concluded the following:

> In the present case, [Father] has a history of criminal behavior that includes an assault on [October 12, 2012], seven . . . burglary, theft and vandalism offenses on January 5, 2014, and [five] similar offenses on December 8, 2013. In addition, this Father was abusing a variety of illegal drugs in the presence of his [five] month old child.

5

It is not difficult for this [c]ourt to find by clear and convincing evidence that [Father's] history of drug abuse and involvement with the criminal justice system demonstrates wanton disregard for the welfare of [the Child] in such a manner as to constitute abandonment of [the Child] within the meaning of [Tenn. Code Ann.] § 36-1-113(g)(1) and § 36-1-102(1)(A)(iv).

Our review of the record demonstrates that the evidence does not preponderate against the trial court's factual findings on this ground. This Court has "repeatedly held that . . . criminal behavior, substance abuse . . . can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867-68. In the present action, Father committed thirteen separate crimes in Hamblen County and Grainger County in the months following the birth of the Child. Father was subsequently convicted of all thirteen crimes. He was incarcerated. This criminal activity alone would be sufficient for us to find wanton disregard by the Father. However, Father's multiple convictions are compounded by his substance abuse documented in the record. Accordingly, we hold that, as a matter of law, the evidence clearly and convincingly demonstrates Father's wanton disregard for the welfare of the Child.

**B.**

After considering the second ground for termination – Father's failure to provide a suitable home – the trial court stated the following:

[Father's] continuous incarceration has made it impossible for him to provide a suitable home for [the Child]. . . . Father proposes to provide a home for [the Child] at the [halfway] house upon his release, but he has failed to fully investigate this situation or provide for adequate child care at the [halfway] house or elsewhere. Further, [Father] has failed to comprehend the extent of [the Child's] serious health issues or make any provision for adequate medical care for [the Child] following . . . Father's release from jail. The [c]ourt seriously doubts there is any possible way [Father] could provide [the Child] with the level of medical care she requires in his proposed living arrangements.

6

> The ability of DCS . . . to assist [Father] in providing a suitable home for this child has been significantly hindered by . . . Father's continuous incarceration and inability to provide his Case Manager with any clear release date. The [c]ourt finds that the Department's efforts have been reasonable under the existing circumstances.
>
> The [c]ourt therefore finds by clear and convincing evidence that [Father] has failed to provide a suitable home for his minor child.

Upon our review of the record in this case, we hold that the evidence does not preponderate against the trial court's factual findings as to this ground. Father was incarcerated at the time of trial, and his release date was uncertain. Nevertheless, Father testified that, once he was released from jail, he would be headed to a halfway house, at which location he intended to parent the Child. At one point during the trial, Father stated that children were allowed to reside in the halfway house, a position he reasserted in his brief. However, Father also freely acknowledged at trial that he was not certain whether the program he planned to enter at the halfway house would be appropriate for the Child. Furthermore, Father admitted he did not know whether the halfway house would allow the Child to live with him because she has both hepatitis B and hepatitis C. In our view, Father's plan for providing a suitable home for the Child at a halfway house is simply too speculative. It becomes even more so when one considers the Child's medical condition, which necessitates frequent trips to the doctor, and the fact that Father would have to find appropriate supervision for the Child when he started working again. When asked how he would address the Child's medical needs, Father said "if she couldn't attend her regular physician, I would try to find one closer to [the halfway house] that I could send her to." However, Father's driver license was suspended, and he did not have a solution for how he would transport the Child to the doctor on his own. As for daycare, Father posited that his family, who live over an hour and a half away in Kentucky, might be able to help look after the Child when he went back to work. Ultimately, we believe Father's plan for providing a suitable home is simply too speculative to address the Child's pressing needs. As a result, we hold, as a matter of law, that the evidence clearly and convincingly demonstrates that Father has failed to provide, and is highly unlikely to provide, a suitable home for the Child.

## C.

When reviewing the third ground for termination – Father's substantial noncompliance with the permanency plan – the trial court concluded the following:

Three . . . [p]ermanency [p]lans for . . . Father were ratified by the [c]ourt. This [c]ourt specifically finds the following requirements of those permanency plans are reasonably related to the grounds for removal and to family re-unification: upon Father's release from jail he would maintain stable housing and income; he would complete [p]arenting classes, he would schedule and complete a mental health assessment and follow all recommendations for individual therapy; he would pay child support; he would have an alcohol and drug assessment and follow all recommendations to complete an [intensive outpatient program]; and he would visit with [the Child]. [Father] has failed to substantially complete any of the plan responsibilities and requirements due to his continued incarceration.

* * *

The Court finds by clear and convincing evidence that [Father] has failed to substantially comply with the reasonable requirements of the [p]ermanency [p]lans in this case.

As previously noted, Father was incarcerated continuously from the time when DCS first became involved in this case through the August 5, 2015 hearing on the petition of DCS to terminate his parental rights. Though he was incarcerated when DCS created all three of the permanency plans, the record reflects that Father did complete the following plan requirements: a parenting assessment, a mental health assessment, and an alcohol and drug assessment. In addition, there is no evidence in the record that Father, while incarcerated, turned down services aimed at helping him address his permanency plan requirements. Furthermore, we are cognizant of the reality that, while he was incarcerated, Father had limited means of securing stable housing and income. While Father certainly failed to comply with certain portions of the permanency plan, we cannot say that his noncompliance was substantial given the fact that his incarceration inherently restricted his access to the means to address some of his requirements. Accordingly, we hold that the evidence does not clearly and convincingly demonstrate that Father failed to substantially comply with a permanency plan. Therefore, we modify the trial court's judgment to eliminate this ground as one supporting termination.

8

## D.

Finally, the trial court held the following with respect to the fourth ground for termination, persistence of conditions:

> It has been more than six . . . months since [the Child] was removed from the custody of her parents in January 2014, due to . . . Father's drug abuse and criminal activity. Over [nineteen] months later, [Father] remains in circumstances that are identical to those existing on the date this child was placed into the custody of the State of Tennessee. Any progress [Father] made to comply with the requirements of the [p]ermanency [p]lans in this case is effectively negated by the reality of his present circumstances. [Father] remains in jail[,] and his future is uncertain. He has no home and no job if he was released tomorrow.
>
> [The Child's] physical condition remains unstable and difficult to manage.
>
> The [c]ourt finds by clear and convincing evidence that the conditions which led to [the Child's] removal and placement in state custody continue to persist despite all efforts of both the State of Tennessee and . . . Father. These conditions, which would likely lead to further neglect of the [C]hild, are unlikely to be remedied soon so that the [C]hild could be returned safely to a stable home environment adequate to meet her significant medical needs. Consequently, continuation of the parent child relationship greatly diminishes the chances of this child being placed into a safe, stable[,] and permanent home.

Based upon our review, we hold that the evidence does not preponderate against the trial court's factual findings on this ground. Tenn. Code Ann. § 36-1-113(g)(3) authorizes termination of parental rights when:

> (3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and;

9

(i)     The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s) still persist;

(ii)     There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii)  The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

In the present action, we agree with the trial court that Father's situation at the time of trial was essentially identical to his condition when DCS filed its petition in March 2015. When the petition was filed, Father was incarcerated, did not have a suitable home, and did not have a legal source of income.  At the time of trial, Father was still incarcerated, did not have a suitable home, and did not have a legal source of income.  Furthermore, the record indicates that Father has been incarcerated ever since the Child was seven months old.  In the end, Father's ongoing issues lead us to believe that continuation of his parent-child relationship with the Child would greatly hinder the likelihood of the Child being integrated into a safe, stable, and permanent home.  Accordingly, we find that, as a matter of law, the evidence clearly and convincingly exhibits persistence of conditions.

## VI.

After finding that there are three statutory grounds warranting termination of Father's parental rights, we now focus on whether termination is in the Child's best interest.  When considering the issue of "best interest," we are guided by the following statutory factors set forth in Tenn. Code Ann. § 36-1-113(i), which provides as follows:

In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

10

(1)   Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interests to be in the home of the parent or guardian;

(2)   Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)   Whether the parent or guardian has maintain regular visitation or other contact with the child;

(4)   Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)   The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)   Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)   Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)   Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

"The above list is not exhaustive[,] and there is no requirement that all of the factors must be present before a trial court can determine that termination of parental rights is in a child's best interest." *State Dep't of Children's Servs. v. B.J.N.*, 242 S.W.3d 491, 502 (Tenn. Ct. App. 2007) (citing *State Dep't of Children's Servs. v. P.M.T.*, No. E2006-00057-COA-R3-PT, 2006 WL 2644373, at *9 (Tenn. Ct. App., filed Sept. 15, 2006)). In addition, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

In the present action, the trial court's September 3, 2015 order terminating Father's parental rights included the following "best interest" analysis:

> It is in the [C]hild's best interests for termination to be granted. . . . Father . . . has not made changes in his conduct or circumstances that would make it safe for the [C]hild to return home, after reasonable efforts by the [S]tate to assist him.
>
> Due to . . . Father's continued incarceration, he has not maintained a regular, meaningful relationship with the . . . Child that would sustain a parent-child bond.
>
> [The Child] suffers from severe health issues that include Hepatitis B (that remains active and contagious) and C (which is currently in remission). The foster parents still have to use "universal precautions" such as gloves to prevent contact with [the Child's] body fluids or when changing her diapers. It's uncertain when or how [the Child's] Hepatitis will progress. [The Child] may also have undiagnosed neurological issues that have begun to manifest themselves. Additionally, [the Child] has serious feeding issues for which she remains in therapy. She requires an extensive regimen of care and daily therapy to insure . . . that her basic health needs are met. It is doubtful that, as a single parent . . . Father will be able to maintain both [the Child's] therapy/medical schedule and full time employment if [the Child] was placed in his care.

[The Child's] pre-adoptive foster family has gone above and beyond to accommodate [the Child's] special needs. It would be extremely difficult, if not impossible, for [the Child] to adjust and thrive in any alternative environment . . . Father could provide at this stage of her life. It is unlikely that any half-way house would allow a child with Hepatitis to reside there with [Father], even if he could provide the level of care [the Child] needs.

[The Child] has not seen . . . Father since she was approximately five (5) months old. She has never bonded to [Father,] and they have no meaningful relationship. To place [the Child] with . . . Father at this point would be equivalent to placing her with a stranger. In contrast, the foster parents have developed a close, loving relationship with this little girl. [The Child] appears to be thriving in their care.

It is manifestly in [the Child's] best interest to remain with the foster family who desire to adopt her and give her permanency in her life.

On appeal, Father contends that the trial court "failed to consider certain important factors or didn't give them the weight they should have been given." In support of this contention, Father argues that he has (1) finished an outpatient drug rehabilitation program; (2) completed parenting classes; (3) undergone mental health, alcohol, and drug assessments; (4) never refused to cooperate with any services offered by DCS; and (5) never used drugs while he was incarcerated. Father also maintains that DCS never "contacted anyone at the Department of Corrections to ascertain if any services could be provided to him while he was in custody." Further, Father alleges that the halfway house "that he would soon be living at" could assist him with outpatient rehabilitation and would allow children "in the program." Finally, Father claims that DCS never permitted him to visit with the Child while he was incarcerated.

We are not persuaded by Father's argument. As we have already articulated, Father has taken some steps toward making himself capable of being a suitable parent for the Child. In particular, we noted his participation in a parenting assessment, counseling, and drug rehabilitation. Nevertheless, we do not believe these efforts outweigh Father's glaring deficiencies as a parent, specifically his inability to secure stable housing and a legal source of income. Meanwhile, the record reflects that the Child has resided with a

13

loving pre-adoptive family ever since she was removed from Father's custody in January 2014. At trial, the pre-adoptive foster mother spoke in great detail about the Child's serious medical issues and the speech, feeding, and physical therapy sessions the Child requires multiple times a week. In addition, the pre-adoptive foster mother explained the extended care the Child receives at home from the pre-adoptive foster family, including multiple hours of daily one-on-one attention from the pre-adoptive foster grandmother, who is a retired nurse. Judging by the evidence in the record, the pre-adoptive foster family has done everything it can to ensure that the Child gets the medical attention, support, and resources necessary for her to thrive. In stark contrast, Father has offered a highly speculative plan to provide housing, medical attention, and daily supervision while he is at work. In our view, it would be inappropriate to remove the Child from the stable and nurturing environment she now enjoys and place her with an individual who clearly does not grasp the seriousness of her daily needs. Accordingly, we conclude that, as a matter of law, the trial court was correct in holding that there is clear and convincing evidence that termination of Father's parental rights is in the Child's best interest.

## VII.

The judgment of the trial court is modified. As modified, the judgment is affirmed. The costs on appeal are assessed to the appellant, B.L.R. This case is remanded for enforcement of the trial court's judgment, as modified, and for collection of costs assessed by the trial court.


_____
CHARLES D. SUSANO, JR., JUDGE